# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

COURTNEY FOGLE, Individually
and All Others Similarly Situated,

  Plaintiff,

  vs.

REYNOLDS CONSUMER
PRODUCTS LLC,

  Defendant.

_____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Courtney Fogle ("Plaintiff"), by and through their attorneys, brings this action individually and on behalf all others similarly situated against REYNOLDS CONSUMER PRODUCTS LLC ("Defendant"). Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## JURISDICTION AND VENUE

1

1. This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant.

2. This Court has personal jurisdiction over Defendant. Defendant has sufficient minimum contacts with the state of Florida and purposefully availed themselves, and continue to avail themselves, to the jurisdiction of Florida through the privilege of conducting its business ventures in the state of Florida, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

3. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendants do business throughout this district, and Plaintiff made their purchase of REYNOLDS CONSUMER PRODUCTS LLC's Reynold's Wrap "Made in U.S.A." Foil Products ("Product") in Brevard, Florida from a retailer in this district and the purchased "Made in U.S.A." Foil Products was delivered to, and used, in this district.

## THE PARTIES

4. Plaintiff, Courtney Fogle, is a natural person and a citizen of Brevard County, Florida, residing in Titusville. Plaintiff purchased "Made in U.S.A." Foil Products from a local retailer. Plaintiff purchased the Product for their own personal use during the applicable statute of limitations.  Plaintiff's most recent purchase was Defendant's "Made in U.S.A." Foil Product, which was purchased throughout.  Prior to purchasing the Products, Plaintiff saw and read the "Foil made in U.S.A." indicator on the packaging.  Plaintiff relied upon this representation and believed that the Product was indeed made in the United States.  Plaintiff reasonably believed that the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.  The Plaintiff held this belief because that was what the packaging representations said and implied.  Had Plaintiff known that the Products' representations were false, she would not have purchased the Products or would have paid less for them.  Additionally, in making this purchase, Plaintiff paid a price premium because the price of Defendant's Products was inflated as a result of the false and misleading claims regarding their origin.

5. Plaintiff is one of the many Americans who seek to buy American Products.

6. Plaintiff trusted the Reynolds Wrap brand, because it is the equivalent of Kleenex (facial tissues) and Vaseline (petroleum jelly) in terms of its identity and position in its product category (aluminum foil).

7. Plaintiff did not expect a product, especially from the Reynolds brand, would promise it was "Foil Made in U.S.A." even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

8. The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

9. Plaintiff would not have purchased the Product if she knew the "Made in U.S.A." representations and omissions were false and misleading, or she would have paid less for it.

10.  Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

11. Defendant REYNOLDS CONSUMER PRODUCTS LLC is a Delaware limited liability company with its principal place of business in Lake Forest, Illinois, which is in Lake County, Illinois.

12. Defendant is one of the oldest producers of aluminum products in the world.

13. Defendant was instrumental in helping the United States achieve victory in the Second World War, through its commitment to converting bauxite into military equipment, used to defeat the Axis powers.

14. For these, and other reasons, Defendant's packaging truthfully states that "Reynolds Wrap [is] TRUSTED SINCE 1947."

15. Defendant's aluminum foil is a staple of Americana, with a variety of uses beyond wrapping up food.

16. The Product is available to consumers in this District from third parties which include grocery stores, warehouse club stores, drug stores, convenience stores, big box stores, and online retailers.

## FACTUAL ALLEGATIONS

17. The Defendant manufactures, labels, markets, and sells aluminum foil under the "Reynolds Wrap" brand which it labels with the words "FOIL MADE IN U.S.A." followed by three stars (the "Product" or "Products").  An exemplar of the Product labeling is below:





18. American consumers value buying products which are made in America.

19. The Federal Trade Commission ("FTC") defines "Made in the United States," and its synonyms, such as "Made in U.S.A.," to mean any unqualified representation, express or implied, that a product, and by extension, the raw materials used in its manufacture, are of U.S. origin. 16 C.F.R. §§ 323.1(a), 323.2.

20. Companies that use unqualified claims that products are "Made in U.S.A." can mislead consumers when raw materials used in those products are sourced and/or transformed outside of the United States.

21. The FTC considers it a deceptive practice to label a product as "Made in the United Staes" unless (1) the final assembly or processing of the product occurs in the United States, (2) all significant processing that goes into the product occurs in

the United Staes, (3) all or virtually all ingredients or components of the product are made and sourced in the United States. 16 C.F.R. § 323.2.

22. Due to Defendant's representation "FOIL MADE IN U.S.A." followed by three stars, consumers will expect that all or virtually all of the raw materials used in the foil Product are sourced from within the United States, and a substantial amount of the transformation of the Product's raw materials into the Product took place within the United States.

23. The three stars reinforce the "MADE IN U.S.A." claim because stars are associated with the flag of the United States.

24. The raw material for the aluminum in aluminum foil is bauxite, the only commercial ore of aluminum.

25. The largest suppliers of bauxite for aluminum include Australia, Guinea, India, Brazil, and Jamaica.

26. Until World War II, the U.S. and France were the world's major suppliers of bauxite, as well as the world's major producers of aluminum.

27. Since 1981, none of the bauxite mined in the U.S. was used for aluminum.

28. In 2013, the U.S. mined 1.3% of the bauxite it used, less than 0.1 percent of world production.

29. U.S.-mined bauxite is used for abrasives, high-temperature refractory materials, and as a high-strength proppant for hydraulic fracturing of oil and gas wells.

30. Without bauxite sourced from outside the United States, it would be impossible to produce the foil Product.  All, or virtually all, of the bauxite used in the Products is sourced from outside of the United States, contrary to the "Made in U.S.A." claim.

31. In the process of making aluminum foil, bauxite is processed and refined into alumina, and alumina is then turned through a smelting process into aluminum in the form of aluminum ingots.  The aluminum ingots are then further processed to make aluminum foil.[1]

32. The Aluminum in the Product is not a "raw material" of the Product because it originates as bauxite and must be transformed from bauxite into alumina and then transformed from alumina into aluminum before it can be further processed into aluminum foil.  The transformation of bauxite to alumina is a multi-step, complicated process, as is the transformation of alumina into aluminum. *Id*. (under the heading "Processing").  According to Geoscience Australia, an agency of the Australian Government.

---

[1] Aluminium, Geoscience Australia, Australian Government (2021), https://www.ga.gov.au/education/minerals-energy/australian-mineral-facts/aluminium

a. In almost all commercial operations, alumina is extracted from bauxite by the Bayer refining process.  The process, discovered by Karl Josef Bayer in 1888, consists of four stages.

   i. Digestion: The finely ground bauxite is fed into a steam-heated unit called a digester.  Here it is mixed, under pressure, with a hot solution of caustic soda.  The aluminum oxide of the bauxite (and the reactive silica) reacts with the caustic soda forming a solution of sodium aluminate or green liquor and a precipitate of sodium aluminum silicate.

   ii. Clarification: the green liquor or alumina-bearing solution is separated from the waste the undissolved iron oxides and silica which were part of the original bauxite and now make up the sand and red mud waste.  This stage involves three steps:  firstly, the coarse sand-sized waste is removed and washed to recover caustic soda;  secondly, the red mud is separated out; and, finally the remaining green liquor is pumped though filters to remove any residual impurities.  The sand and mud are pumped together to residue lakes and the green liquor is pumped to heat exchangers where it is cooled from 1000°C to around 650-790°C.

iii. Precipitation: the alumina is precipitated from the liquor as crystals of alumina hydrate. To do this, the green liquor solution is mixed in tall precipitator vessels with small amounts of fine crystalline alumina, which stimulates the precipitation of solid alumina hydrate as the solution cools. When completed the solid alumina hydrate is passed on to the next stage and the remaining liquor, which contains caustic soda and some alumina, goes back to the digesters.

iv. Calcination: the alumina hydrate is washed to remove any remaining liquor then dried. Finally, it is heated to about 1000°C to drive off the water of crystallization, leaving the alumina – a dry, pure white, sandy material. A portion of the alumina may be left in the hydrate form for further processed for the chemical industry.

b. Alumina is turned into aluminum through a smelting process. All commercial production of aluminum is based on the Hall-Heroult smelting process in which the aluminum and oxygen in the alumina are separated by electrolysis. Electrolysis involves passing an electric current through a molten solution of alumina and natural or synthetic cryolite (sodium aluminum fluoride). The molten solution is contained

10

in reduction cells or pots which are lined at the bottom with carbon (the cathode) and are connected in an electrical series called potline. Inserted into the top of each pot are carbon anodes, the bottoms of which are immersed in the molten solution.

i. The passage of an electric current causes the oxygen from the alumina to combine with the carbon of the anode forming carbon dioxide gas. The remaining molten metallic aluminum collects at the cathode on the bottom of the pot. Periodically, it is siphoned off and transferred to large holding furnaces. Impurities are removed, alloying elements added and the molten aluminum is cast into ingots.

ii. The smelting process is a continuous one. As the alumina content of the cryolite bath is reduced more is added. Heat generated by the passage of the electric current maintains the cryolite bath in its molten state so that it will dissolve the alumina. A great amount of energy is consumed during the smelting process; from 14000 – 16000 kilowatt hours of electrical energy is needed to produce one tonne of aluminum from about two tonnes of alumina. Aluminum is sometimes referred to as 'solid electricity' owing to the large amount of

power used in its production. The availability of cheap electricity is therefore essential for economic production.

c. Aluminum ingots are produced in various shapes and sizes depending on their end use. They may be rolled into plate, sheet, foil, bars or rods. They may be drawn into wire which is stranded into cable for electrical transmission lines. Presses extrude the ingots into hundreds of different useful and decorative forms or fabricating plants may convert them into large structural shapes.

33. A substantial amount of the bauxite that is used to make (ultimately) the aluminum that is used in the Product is transformed into alumina outside of the United States. See Top Alumina Refineries in the World, AL CIRCLE BIZ (Sept. 27, 2021). Top five alumina refineries in the world by capacity, AL CIRCLE (Beethika Biswas ed. Dec. 15, 2018), https://www.alcircle.com/news/top-five-alumina-refineries-in-the-world-bycapacity-39754 [https://perma.cc/B2SJ-Z4QB] (alumina production in North America (including Canada) from the first quarter to the fourth quarter in 2018 accounted for only around 2.2% of world alumina production). A document by Alcoa, which is a major bauxite miner, alumina refiner, and aluminum smelter, identifies the top 20 global bauxite mines excluding China in 2023 by Wood Mackenzie estimated annual production, as well as the top 20 global alumina refineries excluding China in 2023 by Wood Mackenzie estimated

annual production; as shown below, none of these bauxite mines or alumina refineries are within the United States. Alcoa announces agreement with Alumina Limited on terms and process to acquire Alumina Limited in an all-stock transaction at 12, ALCOA (Feb. 25, 2024) https://s29.q4cdn.com/945634774/files/doc_presentations/2024/Feb/25/alcoa-investor-presentation-20240225_final.pdf [https://perma.cc/JXW2-2KFW]; see also id. at 9, 11, 20.

**Top 20 global bauxite mines ex China (2023), as listed in Alcoa document**

1. SMB-WAP- Guinea
2. Weipa/Amrun – Australia
3. Huntly – Australia
4. CBG – Guinea
5. Boddington – Australia
6. Boffa – Guinea
7. Sangaredi – Guinea
8. Trombetas – Brazil
9. Gove – Australia
10. Paragominas – Brazil
11. Willowdale – Australia
12. Panchpatmali – India
13. Baphlimali – India
14. Juruti – Brazil

13

15. Indonesia Ketapang – Indonesia

16. Al Ba'itha – Saudi Arabia

17. Timan – Russia

18. Bauxite Hills (Project) – Australia

19. Discovery Bay – Jamaica

20. Kodingamali – India

**Top 20 global alumina refineries ex China (2023), as listed in Alcoa document**

1. Alunorte – Brazil

2. Worsley – Australia

3. Pinjarra – Australia

4. Alumar – Brazil

5. Gladstone (Qal) – Australia

6. Yarwun – Australia

7. Wagerup – Australia

8. Al Taweelah – United Arab Emirates

9. Utkal – India

10. Damanjodi – India

11. Ketapang – Indonesia

12. Ras Al-Khair – Saudi Arabia

13. Lanjigarh – India

14. Bintan Alumina – Indonesia

15. Vaudreuil – Canada

16. Aughinish – Ireland

17. Kwinana – Australia

18. Pavlodar – Kazakhstan

19. Jamalco – Jamaica

20. Bogoslovsk – Russia

34. A substantial amount of the alumina that is used in the aluminum that is used in the Product is transformed into aluminum outside of the United States. See Aluminum smelters of the World (outside of China), ASKJA ENERGY PARTNERS (Sept. 29, 2020), https://askjaenergy.com/2020/09/29/aluminum-smelters-of-the-world-outside-of-china/ [https://perma.cc/N6DZ-MJ5M]; From ore to ingots: Meet the top 5 aluminium smelters in the world, AL CIRCLE BIZ (Jan. 12, 2024), https://www.alcirclebiz.com/blog/from-ore-to-ingotsmeet-the-top-5-aluminium-smelters-in-the-world [https://perma.cc/A98C-YQJ4].

35. Because a substantial amount of the bauxite that is used (ultimately) in the aluminum in the Products, as well as a substantial amount of the alumina that is used in the aluminum in the Products, are transformed into aluminum outside of the United States, a substantial amount of the making, manufacturing, and/or production of the aluminum foil Products takes place outside of the United States, contrary to the "Made in U.S.A." claim.

36. Defendant attempts to qualify the "Made in U.S.A." claim by purporting to limit its applicability to the "FOIL," that the "FOIL [is] MADE IN U.S.A."

37. This is insufficient to qualify the "Made in U.S.A." claim because consumers are not familiar with the sources of bauxite, the locations where bauxite is

15

transformed into alumina, or the locations where alumina is transformed into aluminum.

38. Reasonable consumers do not understand Defendant's claim to refer only to the processing of aluminum ingots into aluminum foil.

39. Assuming (without conceding) that Defendant processes aluminum ingots into aluminum foil only in the United States, using only American workers, the claim is not qualified to state only this.

40. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

41. Consumers frequently rely on representations, imagery, colors, and information on the labeling of products such as aluminum foil—especially the front labeling—in making purchase decisions.

42. Reasonable consumers read and relied on Defendant's "Made in U.S.A." representations when purchasing the Products, as they were on the front labeling of the Product.

43. At the time Plaintiff and reasonable consumers purchased the Products, they did not know, and had no reason to know, that the Products' "Made in U.S.A." representations on the label were false, misleading, deceptive, and unlawful as set forth herein.

44. Defendant's "Made in U.S.A." representations were material to Plaintiff's and the Class members' decisions to purchase the Products.

45. Defendant knew, or should have known, that the "Made in U.S.A." representations were false, misleading, deceptive, and unlawful, at the time that it advertised the Products and intentionally and deliberately placed the "Made in U.S.A." representations on the Products' labeling and packaging.

46. Plaintiff and the Class members paid a price premium for Defendant's aluminum foil Products based on the "Made in U.S.A." representations.

47. The value of the Products that Plaintiff purchased was materially less than their value as represented by Defendant by means of the "Made in U.S.A." representations.

48. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

49. Had Plaintiff and the Class members known the truth, they would not have bought the Product or would have paid less for it.

50. As a result of the false and misleading representations, the Product is sold for a price premium, approximately no less than $4.99 per 75 square feet, excluding tax or any sales, higher than similar products, represented in a non-misleading way, and

higher than it would be sold for absent the misleading representations and omissions that the Product is "Foil Made in U.S.A."

## CLASS ACTION ALLEGATIONS

51. **Class Definition:** Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

All persons in the State of Florida who purchased the Products during the fullest period of law.

52. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

53. **Numerosity and Ascertainability:** Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout Florida. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

54. **Typicality and Adequacy:** Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

55. **Commonality:** The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

a. whether Defendant committed the conduct alleged herein;

b. whether Defendant's conduct constitutes the violations of laws alleged herein;

c. whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

d. whether the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products are adulterated and/or misbranded under the Florida or federal law;

e. whether Defendants knew or should have known that the representations were false or misleading;

f.      whether Defendants knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products.

g.  whether Defendant's representations, concealments and non-disclosures concerning the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products are likely to deceive the consumer;

h.  whether Defendant's representations, concealments and non-disclosures concerning the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products violate FDUTPA and/or the common law;

i. whether Defendants should be permanently enjoined from making the claims at issue; and

j. whether Plaintiff and the Class are entitled to restitution and damages.

68. **Predominance and Superiority:** Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits makes it impossible and

impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

   a. given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

   b. when Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

c.  this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d.  without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct.

69. **Manageability:** The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

## <u>COUNT I</u>

**For Violations of Florida's Deceptive**

**and Unfair Trade Practices Act,**

**Fla. Stat. 501.201 et seq.**

70. Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 9-69 above as if fully set forth herein.

71. Plaintiff brings this claim on their own behalf and on behalf of each member of the Class.

72. Defendants violated and continue to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business.

73. The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that the REYNOLDS CONSUMER PRODUCTS LLC "Made in U.S.A." Foil Products were manufactured and sourced in the United States.

74. Plaintiff and Class members relied upon these advertisements in deciding to purchase the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products.  Plaintiff's reliance was reasonable because of Defendant's reputation as a reliable company.

75. Had Plaintiff known that the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products were not as advertised, they would not have purchased the product. As a result of Defendant's deceptive and unfair acts, Plaintiff and Class members have been damaged.

76. Defendant's conduct offends established public policy, and is immoral, unethical, oppressive, and unscrupulous to consumers.

77. Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

78. Defendants should also be ordered to cease their deceptive advertising and should be made to engage in a corrective advertising campaign to inform consumers that its REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products did not in fact contain 60 and 80 grams of protein respectively.

## COUNT II

### For False and Misleading Advertising,

### Fla. Stat. § 817.41

79. Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 9-69 of the Complaint as if fully set forth herein.

80. Plaintiff brings this claim on their own behalf and on behalf of each member of the Class.

On their website, in print advertisements, and in other forms of advertisements, Defendants made numerous misrepresentations of material fact regarding the composition of the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products.

81. Defendants knew that these statements were false.

82. Defendants intended for consumers to rely on its false statements for the purpose of selling the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products.

83. Plaintiff and Class members did, in fact, rely upon these statements. Reliance was reasonable and justified because of Defendant's reputation as a reliable company.

84. As a result of Defendant's misrepresentations, Plaintiff and Class members suffered damages in the amount paid for the REYNOLDS CONSUMER PRODUCTS LLC Reynold's Wrap "Made in U.S.A." Foil Products.

85. Plaintiff and Class members are entitled to damages and injunctive relief as set forth above.

## COUNT III

### Unjust Enrichment

86. Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 9-69 of the Complaint as if fully set forth herein.

87. Plaintiff brings this cause of action on behalf of herself and on behalf of the Class.

88. Plaintiff and Class members conferred a benefit on Defendants by purchasing the deceptively advertised Product at an inflated price.

89. Defendants received the monies paid by Plaintiff and Class members and thus knew of the benefit conferred upon them.

90. Defendants accepted and retained the benefit in the amount of the profits they earned from Defendant's Product sales paid by Plaintiff and Class members.

91. Defendants have profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

92. Plaintiff does not have an adequate remedy at law against Defendants.

93. Plaintiff and Class members are entitled to restitution of the amount paid for the Product and disgorgement of the profits Defendants derived from their deceptively advertised Product sales.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

a.      Certify this action as a class action;

b.      Award compensatory, statutory, and punitive damages as to all Counts where such relief is permitted by law;

c.      Enjoin Defendant's conduct and order Defendants to engage in a corrective advertising and labeling/disclosure campaign;

d.      Award equitable monetary relief, including restitution;

e.      Award pre-judgment and post-judgment interest at the legal rate;

f.      Award Plaintiff and Class members the costs of this action, including reasonable attorneys' fees, costs, and expenses; and

g.      Award such other and further legal and equitable relief as this Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  April 12, 2024                        <u>s/William C. Wright</u>

WILLIAM WRIGHT
The Wright Law Office
FL Bar No. 138861
515 N. Flagler Drive
Suite 350
West Palm Beach, FL 33401
Telephone: (561) 514-0904
willwright@wrightlawoffice.com